LOBRANO, Judge.
This appeal arises out of a child custody case involving three juveniles, T.T., age 9; L.T., age 8 and R.T., age 6.[1] Prior to the *66 events forming the basis of this matter, all three juveniles resided with their natural parents.
At the time of the custody hearing, the legal and permanent care, custody and control of all three juveniles was with the Louisiana Department of Health and Human Resources (DHHR). The physical care, custody and control of T.T. and R.T. was with their maternal grandparents. The physical care, custody and control of L.T. was with her maternal great uncle and aunt.
Following a four day hearing, the trial court continued the temporary care, custody and control of T.T. and R.T. and the permanent care, custody and control of L.T. with DHHR. The physical care, custody and control of T.T. and R.T. was returned to their natural parents with biweekly visitation granted the maternal grandparents. DHHR was ordered to monitor the well being and living arrangements of the children. T.T., R.T. and the parents were ordered to attend regular family counseling at a mental health clinic.
The physical care, custody and control of L.T. was continued with her great uncle and aunt with bi-weekly visitation granted the parents. It is from this judgment that the natural parents, appellants, have appealed.
FACTS:
Marsha Hippier, child custody worker for DHHR testified that on July 27, 1981, the children’s maternal grandmother filed a complaint with the St. Bernard office of DHHR alleging her three granddaughters were neglected and that their parents were mentally incapable of caring for them. In her possession, the grandmother had a letter from a psychiatrist stating the mother of the children was in need of hospitalization. Mrs. Hippier testified that she was aware of past friction between the parents and grandparents dating back to a prior custody matter in 1979 but, because of the letter from the psychiatrist, felt further action was necessary. Mrs. Hippier immediately obtained an emergency shelter care order which placed all three children in the shelter care custody of the grandparents.
The following day Mrs. Hippier contacted the parents and took their statement concerning the matter. The mother stated she and her husband had been having marital problems and due to these difficulties she took the children and returned home to her parents. While staying with her parents, her father suggested she take a vacation to Florida with her younger sister in order to rest and relax. While in Florida, she and her sister began to quarrel. She left Florida and returned to New Orleans. Rather than return to her parents home, she went to her own apartment to try to “iron out” her marital problems. It wasn’t until five days after her return home that she contacted her parents. Meanwhile, her parents had been informed of her departure from Florida and that no one knew of her whereabouts. It was during this period of time that the grandmother filed the complaint with DHHR.
After the five day stay with her husband, the mother attempted to retrieve her children from her parents’ home as she and her husband had decided to try to work out their problems. She was denied the return of the children as legal custody had already been given to DHHR. She was told that because of the letter from the psychiatrist stating she was in need of hospitalization, it was determined that further investigation was necessary.
Appellants, the natural parents, appeal the judgment of the trial court asserting that in the absence of clear and convincing evidence of unfitness of the parents, the Trial Court committed the following specifications of error:
1) the trial court erred in awarding legal custody to the Louisiana Department of Health and Human Resources.
2) the trial court erred by awarding visitation rights to the maternal grandparents who had done all in their power to break up the family unit.
3) the trial court erred by awarding the physical custody of L.T. to her maternal great uncle and aunt.
*67 Relying on LSA R.S. 9:403(A)(l)(a),[2] the parents forcefully argue that DHHR’s initial taking of the children, based on the alleged abandonment of the children, was illegal as the children were never legally abandoned. In this regard we have reviewed the Affidavit in Support of Request for Instanter Order, the Instanter Order itself, and the Petition for Permanent Custody filed by DHHR and find them devoid of any allegations of abandonment. All documentation and court orders leading up to the removal of the children from the custody of the parents addresses the mental capacity of the parents to care for the children and the alleged neglect of the children. The parents argument that the legal custody of the children should be returned to them because the children were never abandoned is not substantiated by the record.
We do not feel it is necessary or relevant to address the long history of hostility between the parents and grandparents characterized by constant recriminations of interference and wrongdoing. There is ample evidence in the record which corroborates the accusations of both. We will address the merits of this appeal solely on the basis of the expert medical testimony as it relates to the well being and best intersts of the children and whether the judgment of the trial court in that regard was manifestly erroneous.
The established rule is that in determining the custody of a child the right of the legal parent to the custody is preferred to that of a nonparent. Wood v. Beard, 290 So.2d 675 (La.1974); Paul v. Cloud, 378 So.2d 586 (La.App.3rd Cir.1979), writ denied 380 So.2d 101 (La.1980). This preferred right must yield however, to the superior right of the state to deprive the parent of the care and custody of the child in the event the physical, mental and moral welfare of the child requires it. Paul v. Cloud, supra. The paramount consideration in a child custody case is the child’s best interest and welfare. Larkin v. Larkin, 386 So.2d 376 (La.App.4th Cir.1980).
Upon appellate review, the determination of the trial judge in court custody matters is entitled to great weight. He is in a better position to evaluate the best interest of a child from his total overview of the conduct and character of the parties. His ruling will not be disturbed on review in the absence of a clear showing of abuse thereof. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971).
With the exception of the children, all parties testified at the custody hearing. Pursuant to various court orders during the pendency of these proceedings, all the parties were psychologically evaluated.
Four medical experts, namely Drs. Harold B. Coco, Charles Ramsey, Jerome Blackman and C.A. Cowardin, testified concerning the results of these evaluations and gave their recommendations to the trial court.
Drs. Coco and Ramsey evaluated the parties only once with Dr. Coco evaluating only the parents and grandparents. He had no first hand contact with the children or with the great aunt.
Neither Dr. Coco nor Dr. Ramsey found any pathology with the parents but Dr. Ramsey did find evidence of instability.
Dr. Coco recommended that all three children be returned to the parents. His testimony, however, was presented in general terms of how it is always best to keep the family unit together. In keeping with that theory, he recommended that the grandparents be allowed to visit with the children regardless of past conflicts.
Dr. Ramsey agreed that T.T. and R.T. should be returned to the parents but was very positive about L.T. remaining with her great aunt. He found L.T. well adjusted and attributed this to the more stable household of the great aunt and the fact that L.T. had been insulated from the con *68 stant fighting and conflicts between the parents and grandparents. He explained how L.T.’s long association with her great aunt created a psychological “bonding” to the great aunt as her “mother” and to remove L.T. would be psychologically traumatic and disruptive. He felt T.T. and R.T., who had not been separated from their parents as long as L.T., would not suffer the same disruptive effects. Both Dr. Coco and Dr. Ramsey recommended that the supervision and well being of the children remain with DHHR and that the grandparents be allowed to visit T.T. and R.T. to insure a smoother transition.
Dr. Blackman’s contacts with the parties were more numerous and extensive. He diagnosed the mother as a borderline schizophrenic unable to cope with the stress associated with handling three small children. He found the father unable to perceive reality, paranoid and with a high potential for child abuse. He diagnosed him as suffering from a disorder called “projected blaming”. He stated that persons with this affliction possess a high potential for child abuse because they blame everything on the children. This finding, coupled with the fact that the grandparents often found bruises and welts on the children after visits with the father, and the fact that all three children were adamant in their negative feelings toward the father because he hit them, lead Dr. Blackman to conclude that the children had suffered from abuse. He also concluded, thru questioning of the father, that there was a very strong possibility that the children were allowed to view sexual contact between the parents.
Dr. Blackman found pathology in the grandmother who displayed definite signs of schizophrenia and had suicidal tendencies. He found the grandfather depressed and totally dominated by the grandmother.
He found evidence of sexual abuse of the oldest child, T.T. by the grandmother which he described as “invading the child’s vagina”. She explained that this activity was prescribed by a doctor. He found the grandmother had an abnormal fixation or attachment for T.T. The child was always with the grandmother and even slept with her. This attachment by the grandmother resulted in the child having no identity of self, depression and dependence on the grandmother to the extent that she showed no independent thought or desire to ever leave her grandmother. This condition he viewed as very damaging psychologically which would result in gross instability and mental illness in adulthood.
Dr. Blackman found that although R.T. fared slightly better than T.T., she displayed abnormal depression and abnormal tendencies toward violent behavior which he attributed to the unstable environment of the grandparents.
Over the many months of evaluating the parents, Dr. Blackman found the mother improved in her appearance but still showed symptoms of borderline psychosis. He attributed her improvement due to the fact that the stress involved with raising the children had been removed. He was firm in his position that to return the children to their parents would re-create the original stressful situation and that ultimately a breakdown would occur. He stated that, in all probability, the effect of such a breakdown would be that someone would be beaten. His concern was not limited to the children being beaten, but also included situations where the children would see the parents strike each other. He stated this type of trauma interferes with the children’s thought processes causing psychological harm.
Dr. Blackman advised against returning any of the children to the parents or allowing T.T. and R.T. to remain with the grandparents. He recommended T.T. and R.T. be placed in foster care and L.T. be allowed to remain with her great aunt and uncle. He found L.T. to be a well adjusted child. She viewed her great aunt and uncle as her parents. He felt to remove her from them would have severe detrimental effects.
Dr. Cowardin’s testimony was limited to extensive evaluations of L.T. She was adamant in her position that L.T. should remain with her great aunt and uncle. She *69 saw in L.T. no glimpse of a positive attitude toward her mother and stated the child made it very clear that she was afraid of her father.
Dr. Cowardin defined good mental health as developing a personality structure which allows one to function in socially appropriate ways. She found it to be highly improbable for L.T. to achieve good mental health if returned to her parents. L.T. would view her parents, the people causing the pain, as taking over as her caretakers. She felt that the likelihood of the parents being able to work through this kind of impediment to parenting would be practically nil and the child, in essence, would have to function without parents. In the child’s mind the parents would be attacking, destructive and non-supportive.
In support of her position that L.T. remain with her great aunt and uncle, Dr. Cowardin testified that L.T. viewed them as her psychological parents. For them she was a wanted child, an absolutely essential relationship for positive personality development and mental health in adulthood.
Given the evidence and expert testimony in this case, we cannot say that the trial judge abused his discretion in finding as he did. Two out of three experts felt that T.T. and R.T. should be returned to the parents with monitoring and supervision by DHHR. Given Dr. Blackman’s testimony as to the bizarre behavior of the grandmother and her own psychological instability, we feel removing T.T. and R.T. from that environment was correct.
L.T. presents a different problem. Here, the trial court was not faced with a judicial comparison of qualified competitors. The trial court had the uncontradicted opinion of the experts that L.T. should not be returned to her parents but should remain with her psychological parents, her great aunt and uncle. Faced with this clear and convincing evidence, the trial court was correct to abide by the experts recommendations if it was to protect her physical, mental and moral welfare.
The facts of this case make it clear that the welfare of the children is superior to the preferred parental custody. We find no manifest error in the trial court’s ruling, and therefore affirm his decision.
AFFIRMED.
BYRNES, J., dissents with reasons.

. This Court prefers to use initials for the children involved rather than their full names.

. LSA R.S. 9:403(A)(l)(a) requires that a child be "deserted for a period of at least four months" by his parents or that the parents’ whereabouts be unknown, in order to constitute abandonment.